TIVO asks this court to uphold contempt on a patent injunction that TIVO reads as an unprecedented prohibition on non-infringing design arounds. But that is not what the injunction says, and Echostar should not have been expected to read it that way. The phrase infringing products is most reasonably and naturally read to mean products that infringe. This was in order to disable the current infringing products in their current infringing form, not in order prohibiting Echostar from taking them. It doesn't say that. It says disable all storage to and playback from. Now, that sounds to me like you ought to have recognized that all means all and have appealed it earlier. Your Honor, it says... I'm asking the waiver question. Well, so let me first explain why it doesn't mean that, and then I'll turn to the waiver question. So, yes, TIVO makes that argument, and TIVO's argument is premised particularly on the notion that infringing products does not mean products that infringe, but rather the following eight model numbers. Now, we know that that can't possibly be what it means, and we can look at it together on page 162 of the injunction of the Joint Appendix. The very next sentence uses the same exact formulation, so it's 162 right at the bottom. Now it's on the enablement point, and it reads the DVR functionality, i.e. disable all storage and playback from a hard disk drive of television data, exactly the formulation Your Honor used, shall not be enabled in any new placements of the infringing products. Okay, so if TIVO's formulation of infringing products is correct, that must mean the DVR functionality shall not be enabled in any new placement of the following eight models, regardless of whether they infringe or not. TIVO tells us... So you're explaining why all doesn't mean all. Well, Your Honor, I'm explaining why TIVO's... But I'm saying, why didn't you just appeal it? Well, Your Honor, there is no reason for anyone reading this injunction to believe that infringing products meant anything other than the products that infringe, and in that sentence, all meant all of the infringing, excuse me, all of the functionality as it existed in the device at the time, not don't design around, which would have been a very unnatural reading, particularly because TIVO never requested any ban on design arounds in the context of this case. TIVO said that it was asking for, in order to prohibit infringement, nothing more, nothing less. Actually, citing two international rectifier, TIVO's current interpretation of the injunction would have required... TIVO's current interpretation would have been both unprecedented and unlawful. TIVO never suggested that there was a curse on the hardware, never sought a recall of either of these boxes, well, never sought a recall of these boxes, never offered this recall light theory that the later, the power to do the lesser included the power to do the greater. And the district court said nothing about any of these notions. So then turning to, finally, Your Honor, the question of waiver, because there was no reason for a reasonable litigant in Echo Star's position to have imagined that the district court was ordering something that TIVO never requested, and certainly that wasn't at all clear, and it would have been illegal, there was no reason to appeal it. And I can imagine the conversation Mr. Dunner would have had with this court at the time. He would have come before the court with all of the issues in front of the court on a very complicated case and said, Your Honors, this injunction is too broad because it illegally prohibits non-infringing conduct. And this court would have said, well, Mr. Dunner, has anyone interpreted it that way? Has anyone asked for it? And he could have said DVR functionality is defined in here, and all means all. Please make sure there's no ambiguity, Court of Appeals. And we could have done so with a stroke of the pen and said infringing is all you can enjoin, of course. And my point, Your Honor, is it would have been unnatural for him to be doing that, especially all the other issues, to stretch to find a meaning for this injunction that no one had proposed. Turning to the infringement provision for a minute, don't you really have to reverse your theories entirely from what you were before to when? Your Honor, on one particular aspect of it, both TIVO and ACOSTAR have switched positions.  We have switched positions, Your Honor, and for good reason. We had a jury verdict against us that told us we lost on that argument. And there's something very unfair in the district court's opinion in saying that we are bound by our losing position, and TIVO is not at all bound by its winning position. But in any event, the court said those positions dealt with hardware, and we're now dealing with software. Isn't that correct? That is what the court said, Your Honor, but no one made the argument that the word parsing meant something different in the two claims. In fact, both TIVO and ACOSTAR took the position that this is one invention. The words mean the same thing in both. In fact, the construction was the same in both. Now, just to back up then, ACOSTAR removed the very features that TIVO had accused it of, that TIVO had accused of infringement. TIVO does not contest that those features are now gone. In our briefs, we posed a challenge to TIVO, multiple challenges. How in the world can you claim that the redesign was essentially the same when you now have to turn to different features, invoke different theories, and prove different facts in order to prove infringement? How can you say that there are no open questions of infringement, which is to say all questions of infringement were already adjudicated against ACOSTAR if you had to present dueling experts to argue about what— But parsing means analyzing, and that's very broad, but it wasn't appealed. We are not—we did not appeal the construction. We're accepting the construction, and I beg to differ with you, Your Honor. Yes, and now this happens very often here. You accept the construction, and then you argue about the construction of the construction. No, Your Honor, we're not. Parsing, Your Honor, does not mean—parsing means analyzing. Parsing video and audio data under the construction of the Court means parsing video and audio data, and the mistake that the District Court made was forgetting that what's supposed to be parsed is video and audio data. But again, this is an open question of infringement now. We're now talking about a totally different feature from the start code detection, which Thiebaud had claimed in the original action performed the parsing. And I hasten to add, when we talk about open questions of infringement, the question you, Your Honor, Judge Rader, asked at the outset is quite relevant. Thiebaud is now having to switch positions on what it is identifying as the parser, which means that that question couldn't possibly have been adjudicated against Echostar in the first proceeding. Thiebaud also can't call the redesign a subterfuge when Echostar managed to achieve two results that Thiebaud's own inventor said were impossible to achieve if those two features were gone, and a highly successful—excuse me, a highly reputable and independent patent firm confirmed to Echostar not only that these products are more than colorably different, but that they were different enough to defeat an infringement claim on five separate theories. So in pages 28 to 29 of our blue brief, we list nine reasons why these devices are not essentially the same. Thiebaud mainly says that all of those are irrelevant, but does not really engage on them. Our main point on colorable differences, Your Honors, is that Thiebaud's—excuse me, the District Court made numerous legal errors. I know Thiebaud was saying this is about deference and clear and convincing—excuse me, a clearly erroneous standard, but that is true as to facts. But here we've got legal errors. Let me just, with my time remaining before my rebuttal time, mention one of them. The District Court mistakenly concluded that removing a feature does not implicate claim terms just because the name that Echostar used for that feature does not appear in the claims. Well, that's, of course, wrong. These features—star code detection, indexing, blocking—were implicating the claim terms. They were the basis on which Echostar had been found to have infringed in the first place. If they didn't implicate claim terms, there could have been no finding of infringement. If there are no further questions, I'd like to reserve the remainder of my time for a while. Thank you, Your Honors. All right. Mr. Waxman. May it please the Court. The trial judge who presided over this case for well over five years has written a careful, detailed opinion, finding Echostar in contempt of two independent provisions of the injunction. But he could not have ever enjoined anything other than infringing conduct, could he? He has the authority under 283—and I'm quoting the statute—to issue an injunction in accordance with principles of equity to prevent violation, not of any patent, but violation of any right secured by a patent on such terms as the Court deems reasonable. And this Court has on occasion—and we're talking here about whether the Court abused his discretion in concluding that with this infringer— But is anyone ever going to interpret that all to be anything other than all conduct that was infringing, not— Well, that— —filling the entire—dismantling the machine. Judge Rader, that is—first of all, the request was not for dismantling the machine. The request was, as your questions pointed out, to disable all DVR functionality with respect to satellite receivers— But some of the functionality is not infringing. Well, at the time that the injunction was issued, the Court had found infringement both of the so-called hardware claims, Claims 1 and 32, that dealt with the media switch and the software claims that are issued here. We made a request to the Court that in our proposed injunction, which is on page 7550 of the Joint Appendix, both with respect to products that are already in subscribers' homes that EchoStar leases to them, that there be a disablement of the software that—or of the functionality that provides DVR functionality. This is a company that provides principally satellite reception service. We asked for that. We also asked with respect to boxes that are in inventory in warehouses, et cetera, et cetera, that they be destroyed. Now, there was no question whatsoever that the judge understood what we were asking for. He provided what we were required, and although it is not relevant under the Supreme Court's decision in Travelers, EchoStar darn well understood what we were requesting. It actually put in its 10Q, which EchoStar has included in the Joint Appendix, language that says, we just lost at trial, we're going to have to litigate the scope of the injunction, and TiVo is requesting that we disable all DVR functionality in the machines that we've placed. But I see nothing that makes it clear that you have to make a hardware fix, go in and literally remove hardware, when all of the infringing conduct could have been taken care of with a software beam down. Exactly the point. And we actually said in our briefs in front of the district court that we were— Can you tell me where you actually said they're going to have to remove the hardware? We never said we were going to have to remove the hardware. We asked for a removal of the infringing DVR functionality, which is accomplished by software, and we said, and Judge, it's at page— In our opening request, in support of the injunction that we requested, we said at page 6063 and 6064 of the joint appendix, 6063 is where we talk about existing placements, 6064 we said, EchoStar can disable the infringing DVR functionality in all DVR units by updating their software via satellite transmission. Now your request—the question you've asked, Judge Rader, about when this court has ever such a thing or approved such a thing, you did it in spindle fabric, where you approved an injunction that extended not just to infringing—I think it was wool spinning products—but all in light of the particular facts of that case. You approved it in footnote 31 of Judge Lurie's decision for the court in Johns Hopkins v. Cellpro with respect to vials of stem cell material that had been created before the patent had issued, had never been shown to infringe, but as you explained, in light of other conduct of the defendant in this case, the trial court was within its discretion to order the destruction of that material. Now, I concede that this is an unusual provision that is tailored to the very unusual facts of this case, and there was a time and a place to seek modification, to seek clarification, to appeal, and EchoStar made a deliberate tactical decision to do none of those things. When it came to this court to seek a stay of the injunction that Judge Folsom issued the first time, it filed stay papers, emergency stay papers, in this court that was all about this injunction is going to make us, you know, stop using DVR functionality. It's going to cost us more than $90 million a month. We need a stay of the injunction. And when it filed its merits brief in this case, not a single one of the 14,000 words was addressed to the scope of the injunction. And other travelers, which, after all, the Supreme Court dealt with a provision that went to the subject matter jurisdiction of the court, the Supreme Court said— Mr. Waxman, I think we've got that point. I'm reading from the place you put me. EchoStar can reprogram and disable the infringing DVR functionality in all units by updating their software via satellite transmission. Correct. Now, that was in support of an injunctive provision, if I can just direct your attention while you have it. How does that require a hardware alteration? It doesn't. We weren't asking for a hardware alteration. We were asking for—and you can see exactly, Judge Rader, what we were asking for at page 7550 of the Joint Appendix, paragraph 6, which requested—maybe I'll wait until you get the page so we don't actually have to read back and forth through each other. Go ahead. Let me make the following point with respect. Under Travelers, it is too late, far too late for a collateral challenge to the scope, application, or interpretation of this provision. Under Travelers, it is also entirely irrelevant what all of these briefs and oral arguments said about this at the time. In Travelers, the parties came to the Supreme Court and said, look, there is substantial evidence that no one understood this order to apply to Travelers' own primary conduct. And Justice Souter, writing for the Court, said, that looks right. You may well be right about that. But the time to raise those claims is over. The language of the injunctive order is plain enough that if there were an issue, this should have been raised before. And this is a paradigmatic example. Now, Mr. Rosencrantz says, well, maybe all doesn't mean all, and maybe the doesn't mean the, and maybe the defined term infringing products doesn't somehow mean the defined term. But the question, even if this were undirected, the question certainly now is whether or not they can seriously contend that no one could have read the terms of this injunction to mean what it plainly does mean. That is, that there was no possibility they could ever have imagined that they would be asked to do exactly what we asked the Court to direct that they do on page 7550. Now, if I may, I mean, I don't want to cut off questions on the disablement provision, but I would like to talk about the infringement positions as well. You have to flip your position here, too, don't you? Not at all. The issue at trial, the overwhelming issue at trial dealt with the media switch in Claim 1. Claim 1 requires that the device have a media switch that parses and separates the audio and video streams. There was an immense titanic battle about this because, and this was an issue on which the PDI filter only analyzes header data, not audio and video. May I first answer the question about whether we had to switch positions, and then I will explain why. I am jumping in ahead. I want to make sure that I am totally responsive here, but let me just say, again, the District Court made a finding of fact that the PID filters, A, haven't changed from then to now, and B, they do analyze video and audio data from said broadcast data. That finding, I am going to explain to you why it is correct. It is surely not clearly erroneous when every single expert at the trial conceded that, either proclaimed it or conceded it. Now, with respect to, again, I think we need to put in context the point that Judge Lurie was making. The main feature of the first trial, the overwhelming feature of their so-called Herculean workaround and their lawyer's letters and their thousands of hours of time dealt with this media switch. We created something that I called the genius of the invention when I was arguing before this Court before, and that was a system in which the media switch would create a logical index of start codes, and that would go into the hard drive along with the actual data and assist a low-cost consumer DVR. You were trying to avoid the PDI filter prior art, right? No, not at all. I mean, there was the PID filters, the PID filters, as I gather they call them in the industry, are ubiquitous. They have been around forever. They are what allows someone to, a device, to take a multi-stream MPEG-2 transport stream that includes up to a dozen channels and lots of other information, including software, and say, hey, the user wants to watch I Love Lucy on Channel 5 at 2 o'clock. What the PID filter does, and there's no dispute about this, like most electronics, there's no dispute about what the software and the hardware does, the entire multi-program MPEG transport stream goes through the PID filters, and the PID filters pick out from the entire flow of broadcast data, they pick out the audio and video segments that are associated with I Love Lucy at 5 o'clock on Channel 5, and then send them otherwise. The question was, do we have a media switch that parses and separates under the meaning of Claim 1? We said, we do. We build this logical index that separates the two logically, and it's created by using a start code detector, which looks at the segments that the PID filters identify and finds the start code for each independent frame. The header. And they, and we, yes, they said, well. Not the video and audio data. I mean, it's all video and audio. Each MPEG segment is 188 bits long. It includes, you know, sort of like genes do. It includes, you know, little codes that are associated with a particular pixel. It includes start codes. It includes the PID. The filter looks through the entire data stream, identifies those pieces of audio and video segments that are associated with I Love Lucy. But it's all scrambled before it hits the PID filter. It's, it is, some of it is scrambled and some of it isn't scrambled. There are some scrambled channels and some unscrambled channels. The audio and video data is clearly scrambled before it hits the PID filter. It is not. There are some programs in which there is some part of the MPEG segment that's scrambled and some parts that aren't. But the point is that surely Judge Folsom was not clearly erroneous in concluding that the PID filters did exactly what every single one of their experts said. I mean, if the PID filters do not analyze broadcast data as the claim requires, I don't know how Dr. Johnson and Dr. Rhine and Dr. Polish, their experts, could have sworn under oath that they met the limitation of the parsing function. But it doesn't say broadcast data. It says audio and video data. That's scrambled. And before it hits the PID filter. First of all, it says, it says, parses, we're talking about claim 31 here. Parses video and audio data from said broadcast data. The entire multi-stream MPEG transport goes through the PID filter. And a PID filter's job is to identify those audio and video segments that are associated with a particular program. Everyone agreed that that is parsing. The dispute at trial was that it doesn't involve separating an audio and video stream. The start code detector and the index did that. The jury did conclude that their devices, because they did build this logical index, did infringe. You reversed on the ground that separated, which is the claim term that was at issue, actually required physical separation and not logical separation. And the law to be applied in, before this court and before the district court on remand, was the claims as construed by the court. The court applied- How do we know what the jury found? We have no, there's no way to know what the jury found, except that we were right. But the question is, under KSM, both step one and step two, the question is whether or not there is a substantial open question of infringement in light of the claims as construed by the court. And in this instance, there are two claim elements. They were both construed. They were not appealed. And the judge was not only not clearly erroneous, he was clearly correct in concluding that they are still met under his claim construction. Thank you. I see my light is on. Thank you. Chair Rosengrant? Yes, Your Honor. Just a few brief points. First, on the disablement provision. Back in 2006, there was no reason at all for a judge to say to Echo Star, you are a recidivist. You need to be disciplined in a particular way, which is what the spindle fabric case that Mr. Waxman talks about says. There was no reason back then for the district court to exceed the boundaries of the Patent Act, which says, 283 says, that this is for preventing infringement. Secondly, back in 2006, Thiebaud never said we need to ensure that Echo Star never designs around with respect to any devices, and certainly did not say that with respect to the devices that were at homes. Third, the test isn't whether someone could have squinted and imagined that this is what the injunction means. The question is whether the injunction is clear, and if Thiebaud has to have two different meanings for the words infringing products, depending upon where they show up in the injunction, it can't possibly claim that its reading is clear. Next, Thiebaud's whole theory for why the Disablement Clause should be read that way is both based on a misreading of the law and a misreading of the context. It is plainly illegal for the district court to order an injunction that exceeds the scope, even under the Patent Act, even under the theory that Thiebaud articulates. Thiebaud's theory is premised on the need to compensate for past harm, and 283, and Johns Hopkins, which Thiebaud just cited, says exactly the opposite. And I'll read from Johns Hopkins. An injunction is not to, quote, fashion a meaningful remedy for past infringement, end quote, unfairly capitalizing on its infringement, end quote. Finally, Thiebaud is just wrong when it says that all of the experts, now moving to the Infringement Clause, that all of the experts agreed that the pit filter was the parser. Thiebaud's own expert absolutely said the exact opposite, and I'll read to the court from the very page that Thiebaud cites. This is Dr. Storer, Thiebaud's expert, who on cross-examination by Echo Star said, yes, parsing is a type of, excuse me, the pit filter does a type of parsing. And then on redirect, counsel says, you were asked some questions about a pit filter by opposing counsel. Do you remember that? I do. Were you given an opportunity to explain? I'm sorry, this is on page 3542 of the record. Well, you could tell I was a little bit frustrated with the yes or no format. So no, I wasn't. Then on the next page, he says, and so inside the receiver card, the input section, yes, there's a little bit of what you might call separation in order to perform this translation, a little bit of what you might call even a type of parsing in order to pick out the correct packets. But, this is the key, just because these are words you use to describe this conversion process, you shouldn't confuse that with the claim terms, which, by the way, is exactly what the district court judge did in his colorable differences analysis. He stopped at the notion of parsing, and Judge Rader, absolutely right, you can't stop there. The question is not does this analyze something, it's does it analyze video and audio data. If there are no further questions, I thank the court for its attention, and we respectfully request that the court vacate the injunction as to both provisions. All right. Thank you, Your Honor. Thank you. Case is submitted.